# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **ARTILIUM AFRICA, LLC**<br>**2331 Mill Road, Suite 100**<br>**Fairfax, VA 22314, and** | : <br> : <br> : <br> : | **CIVIL ACTION** |
| **TRISTAR AFRICA TELECOM, LLC**<br>**2331 Mill Road, Suite 100**<br>**Fairfax, VA 22314,** | : <br> : <br> : <br> : | |
| **Plaintiffs,** | : <br> : | **JURY TRIAL DEMANDED** |
| **v.** | : <br> : | |
| **PARETEUM CORPORATION**<br>**1185 Avenue of the Americas, 37th Floor**<br>**New York, NY 10036,** | : <br> : <br> : <br> : | |
| **Defendant.** | : | **NO. _____** |

## COMPLAINT

AND NOW, comes Plaintiffs, ARTILIUM AFRICA, LLC, and TRISTAR AFRICA TELECOM, LLC, (hereinafter "Plaintiffs") by and through their counsel, O'Hagan Meyer LLP, who bring this suit against Pareteum, Inc. (hereinafter "Pareteum" or "Defendant") and in support thereof avers the following:

## NATURE OF THE ACTION

1.     This action is commenced by the Plaintiffs against Defendant for actual, consequential, and punitive damages for tortious interference with contract and civil conspiracy arising out of the Defendant's conduct in connection with its interference in a contract by and between Plaintiffs and Artilium, plc.

## PARTIES

2.      Plaintiff, ARTILIUM AFRICA, LLC (AA), is a limited liability company formed under the laws of Virginia with its principal place of business at 2331 Mill Road, Suite 100, Fairfax, Virginia 22314.

3.      Plaintiff, TRISTAR AFRICA TELECOM, LLC (TAT) is a limited liability company formed under the laws of Virginia with its principal place of business at 2331 Mill Road, Suite 100, Fairfax Virginia 22314.

4.      Defendant, Pareteum Corporation (Pareteum) is organized under the laws of the State of Delaware with its principal place of business at 1185 Avenue of the Americas, 37th Floor, New York, NY 10036.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000, exclusive of costs.

6.      This Court has personal jurisdiction over Defendant because Pareteum Corporation is a Delaware corporation incorporated under the laws of the State of Delaware.

7.      Venue is proper in the District of Delaware pursuant to 28 U.S.C. § 1391(b)(3) because Pareteum Corporation is a Delaware corporation and subject to personal jurisdiction in this Court in this case.

## FACTUAL BACKGROUND

### A.   ARTILIUM AFRICA, LLC

8.      After extensive communications and negotiations, in early May of 2016, Artilium, plc ("Artilium") (predecessor-in-interest to "Artilium, Ltd.") a provider of innovative telecommunication software and solutions, announced in a press release that it was partnering with Tritente Global Energy Group ("Tritente") of Washington, D.C., Ethiopia, and Kenya to launch AA (www.artilium-africa.com) in order to meet the demand for data and telecom services in Africa, the fastest growing continent in the world.

9.      Given the low-cost environment in Africa and the wide range of services that would be made available by Artilium, the agreement with Tritente was structured within the Operating Agreement (the "Agreement") of AA.

10.     The partnership between Artilium and Tritente was intended to bring Artilium's 3G-4G mobile data service, cloud and innovative telecom services to the African market.

11.     AA started to acquire a value added services license in Ethiopia and was already in discussions with a number of potential customers for the provision of specific services in that country.

12.     Artilium's disruptive micro-data center was an ideal solution to distribute telecom services throughout Africa where 1.3 billion people reside. Artilium already served 50 telco brands such as T-Mobile and 10 million users in 20 countries with its services, but as yet none based in Africa.

13.     Bart Weijermars, Chief Executive Officer of Artilium was quoted as saying: "Tritente is the perfect platform for Artilium to expand into Africa, which is in the early stages of the data and telecom revolution. Tritente is leading $6 billion of projects in renewable

energy and power transmission in Sub Saharan Africa. They can open avenues in dozens of the 52 Sub Saharan countries."

14.     Paul Delkaso**,** CEO of Tritente and Managing Partner of AA, said:  "Our plan is to bring the AA solution to every African country mobile operator, MVNO business, educational institution, Government entities and every cell phone holder."

15.     Mr. Delkaso, who is based in the Washington, D.C., area, travelled to Africa to establish operations in the first of six countries. In contrast to the traditional large-scale, mega-data centers which consume massive electricity, AA expected to have 10-20 times more energy-efficient, micro-data centers spread throughout each country. Most would be powered by renewable energy and include next-generation energy storage.

16.     Artilium and Tritente negotiated and signed a joint venture agreement that was encompassed in the Agreement for AA, a copy of which is attached hereto as ***Exhibit A.***

17.     In connection with the Agreement, Tritente formed TAT to act as the member of AA. Likewise, Artilium formed Green Globe Services, LLC (GG), to be owned by certain Artilium officers who would own directly a portion of Artilium's share of AA, and to be the member of AA.  Nevertheless, Artilium and GG were obligated under, and signatories to, the Operating Agreement for AA.

18.     Thereafter, Paul Delkaso proceeded to sign exclusive Memoranda of Understanding (MOUs) with six African nations to develop the telecommunications and cloud-based hardware and software services.

19.     Suddenly, in the July-October 2017 timeframe, Artilium began to demand capital contributions of Tritente, none of which were called for in the Agreement.  Ultimately, Artilium abandoned the project with Tritente completely.

### B.   PARETEUM'S ROLE

20.    Pareteum negotiated to acquire, through merger, Artilium in June of 2018.

21.    On June 7, 2018, Pareteum announced that, effective upon completion of the acquisition, Artilium's CEO, Bart Weijermars, would be engaged as Chief Executive Officer of Pareteum Europe and Artilium as subsidiaries of Pareteum. The transaction closed in September/October 2018, subject to the satisfaction of certain conditions.

22.    Prior to closing, Artilium abandoned the joint venture with Tritente.

23.    In its Proxy filed with the SEC on June 18, 2018, on the Pareteum/Artilium merger, Pareteum made the following admission:

**Prior Contracts and Transactions Between the Parties**

Artilium and Pareteum have since October 2017 benefitted from a strategic alliance entered into with the intention of jointly pursuing new and developed markets, accelerating growth and increasing market penetration for both Artilium and Pareteum.

***On October 16, 2017, Pareteum entered into a Strategic Alliance Agreement (which we refer to as the "Strategic Alliance Agreement") with Artilium for the mutual pursuit of joint commercial opportunities. Pursuant to the Strategic Alliance Agreement, the parties may enter into a project agreement to provide their technological solutions (which we refer to as the "Solutions") to a customer.*** The project agreement shall stipulate, among other things: (i) which party will take the lead in preparing and submitting any appropriate proposal, RFP and/or tender documentation; (ii) which party will be the prime or principal contractor and which party will take a joint or sub-contracting responsibility; (iii) which party is responsible for which aspects of which of the Solutions or project (in accordance with an opportunity registration form, which is included as an appendix to the project agreement); (iv) commercial and financial provisions (in accordance with the commercial framework and the opportunity registration form, which are included as appendices to the project agreement); (v) the standard terms and conditions of supply of Solutions to the customer; as well as, if applicable (vi) a price list of Solutions and other terms and conditions governing the same.(Emphasis added).

Pursuant to the project agreement, the parties submit a proposal in response to a customer's tender, which will define the parties' respective rights and obligations during the submission of the proposal to the customer. In the months since

entering into the Strategic Alliance Agreement, Pareteum and Artilium have collaborated on at least 18 opportunities, resulting in seven sales wins and an increasing pipeline of potential deals to pursue. Pareteum estimates that over $65 million has been added to its 36-month contractual revenue backlog as a direct result of the engagement. The two management teams have also worked well together and proven to be highly complementary.

In conjunction with the Strategic Alliance Agreement, on October 16, 2017, Pareteum entered into a share exchange agreement with Artilium. Pursuant to the exchange agreement, Artilium agreed to issue and deliver to Pareteum an aggregate of 27,695,177 of its newly issued ordinary shares in exchange for 3,200,332 restricted shares of Pareteum common stock. The exchange transactions closed on October 16, 2017. As of June 6, 2018, Pareteum owned approximately 7.800]% of the issued share capital of Artilium, and Artilium owned approximately 5.85% of the issued and outstanding shares of Pareteum common stock. On completion of the Acquisition, the shares of Pareteum common stock held by Artilium will be cancelled, and no consideration will be paid to Pareteum in respect of the ordinary shares of Artilium held by Pareteum immediately prior to the Acquisition.

24.     Also in the press, it was noted that Pareteum's Global Mobility Cloud Platform including its full MVNE capability, API platform, Home-Location-Registry-as-a-Service, and Internet-of-Things (IoT) ready connectivity solution, when combined with Artilium OneApp, complementary data center infrastructure and Arta solution suite will enable Carriers, Enterprises and IoT service providers to have a complete solution from retail to network.

25.     Pareteum and Artilium's combined cloud-based product sets were intended to continue the Pareteum philosophy of connecting any device, anywhere, on any network. Pareteum announced:

"Through this partnership, we expect both companies will accelerate growth and market penetration. *We see Asia and Africa as a strategic next step, and plan to move on to jointly pursue those and additional markets across the world," stated Hal Turner, Executive Chairman of Pareteum.* "With an estimated 23% compound annual growth rate for IoT devices through 2021, developing markets such as Asia and Africa are poised to become major drivers of growth." (Emphasis added).

"Pareteum and Artilium are a natural fit to build a joint-solution. We are combining Pareteum's recent success in the IoT and API economy and our deep

roots in the network MVNE market, with Artilium's robust retail, enterprise, ecommerce, and converged app platforms to create a winning combination," Mr. Turner added.

"Artilium brings a substantially well-developed retail service portfolio to the market, including in high-growth developing markets. This asset will be further leveraged as a result of Artilium and Pareteum's strategic alliance, strengthening each company's business and enabling us to jointly pursue revenue-expanding contracts with other mobile telecommunications providers worldwide," stated Jan-Paul Menke, Chairman of Artilium.

26.    Vic Bozzo, CEO of Pareteum, stated: "I am pleased to have the opportunity to build a joint solution with Artilium, and to combine forces to attack the markets we currently serve *as well as exciting new and high-growth markets where our combined scale will support our mutual rapid growth, leveraging our respective IoT resources. I am especially excited to be building that together with the Artilium team*." (Emphasis added).

27.    Bart Weijermars, CEO and Director of Artilium commented: "As we have focused on our application, ecommerce and call center suite of products in support of the MVNO retail market, the strength of the Pareteum platform and global reach in MVNE and IoT enables us to bring full turnkey solutions to our data center and enterprise customers worldwide."

28.    Based on the foregoing, it is clear Artilium and GG dumped AA, TAT, and Tritente when Pareteum came on the scene.  Artilium's action to disenfranchise AA and TAT came following a series of communications wherein it became clear that Artilium was setting up a pretext to abandon AA and TAT.

## C.    ARTILUM'S MANUFACTURED PRETEXT

29.    In fact, on August 15, 2017, Mark Westerfield, Esquire, counsel for TAT, wrote to challenge Artilium that it was or could have been "astonished" by the statement that AA had not finalized its agreement for services and pricing with Hamilton Telecom.

30.     Although Artilium sent price quotes to Hamilton Telecom in January of 2017, there was no communication indicating an agreement was reached.  For months, John Kamya had been speaking with Paul Delkaso about the timing and need for finalizing the agreement on services and pricing. All parties knew that there was no subsequent agreement signed by anyone which accepted the services/pricing, nor any other agreement which outlined the services which would be provided, the schedule for providing those services, and/or the pricing for those services.

31.     Artilium misrepresented facts to its management and shareholders as to the status of the project with Hamilton Telecom, apparently to hide the fact that it was unable to complete the agreement and/or was unaware that no agreement had been reached.

32.     Likewise, Artilium fabricated the concept that stakeholders or members in AA were required to make a "capex investment," *i.e.*, invest capital into AA. Contrary to those assertions, there is no obligation on the part of any shareholder in AA to invest capital into the business.  *See **Exhibit A***, § 5.  The governing documents are quite clear and were pointed out to Artilium and its legal counsel on numerous occasions.

33.     Artilium likewise failed to explain what precisely this "capex investment" entailed, the legal basis for the investment, and how these funds would be utilized.

34.     When AA was formed, the members agreed that Artilium would provide technical services for AA's customers and Artilium would be compensated at its "cost plus 10%."  Artilium acknowledged, therefore, that it alone would be responsible for raising any capital necessary in order for Artilium to provide the services which it was obligated to provide, as required under the AA Operating Agreement.

35.     In November 2016, at a meeting between AA and Hamilton Telecom (and other customers) at Artilium's offices, the topic of raising capital for the purpose of funding a "capital" expenditure was never raised.  At that same time, AA met with representatives of GiG.tech, the subject of raising capital to pay for some non-specified "capital" expenditure was never raised.

36.     In fact, Artilium was unwilling to make 100% of the capital investment which it claimed was required in order for Artilium to fulfill its contractual obligations to AA and AA's customers. Artilium sought to avoid its obligation to provide the services to AA's customers, including any capital investment that may be required to fulfill that obligation, as required under the Operating Agreement.

37.     Moreover, on multiple occasions, Artilium was asked to provide details on the $4 Million capital investment which it demanded of TAT.  TAT asked if the investment was for capital or for operating expenses; if for capital expenses, an itemization of the expenses and complete details on what capital equipment would be purchased with these funds.

38.     TAT asked for a clear explanation of the financial relationship between Artilium and GiG.tech. TAT asked for an explanation of whether under Artilium's plan, the capital would be utilized by AA to purchase the servers directly from GiG.tech. TAT also asked why Artilium planned to purchase servers directly from GiG.tech, contrary to the previously described business plan by which the GiG.tech would be compensated by Artilium based on capacity utilized and the services provided.

39.     TAT shareholders indicated it was unwilling to agree to any capital investment in AA until its questions were answered.  Nevertheless, no one at Artilium responded to those inquiries.

40.     Artilium was informed that TAT's plan, if and when a capital investment was deemed necessary on the part of AA, was to utilize the finalized agreement with Hamilton Telecom (or other customers) to obtain a loan or an outside investor to provide the necessary funding.

41.     On several occasions, TAT has asked Artilium to state whether it intended to continue business operations in Africa and to provide a status update on several customers and projects, which it deliberately kept secret and refused to include TAT's representative, Paul Delkaso in the communications. Artilium has failed and refused to respond in a substantive manner to any inquiries.

42.     It is now clear that Artilium entered into discussions with Pareteum and used the capex investment demand and other distractions as a pretext to jettison its relationship with TAT and its investment in AA, and, to purse the same identical business plan with Pareteum.

43.     Further, Artilium's communication with John Kamya was a deliberate attempt to cover up and/or excuse Artilium's failure to fulfill its obligations under the AA Operating Agreement and its obligations to AA's customers.

44.     Artilium's statements to Mr. Kamya were also false and intended to mislead him and to subvert AA's business operations. Those statements were a knowing and intentional violation of personal obligations as a Board Member and Artilium's obligation as a shareholder to act in furtherance of, and consistent with the duty of loyalty to, AA.

45.     Moreover, as a stranger to the AA Agreement, Pareteum was not privileged to interfere with the Agreement.

## COUNT I

### TORTIOUS INTERFERENCE WITH CONTRACTS AND PROSPECTIVE ECONOMIC ADVANTAGE BY DEFENDANT

46.     Plaintiffs re-allege and incorporate each of the foregoing paragraphs by reference as if fully set forth herein.

47.     There are four elements to a claim of tortious interference with contractual relations in Virginia: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

48.     Plaintiffs and Artilium had a valid contract, the Agreement whereby Artilium would provide software services relating to wireless phone and internet services in Africa.

49.     Plaintiffs had contracts and/or MOUs with 6 African nations for the provision of such services and and/or reasonable expectations of entering into over a dozen more contracts and/or MOUs with African nations concerning the provision of such services.

50.     Defendant had full knowledge of the Agreement.

51.     Defendant had full knowledge of Plaintiffs' reasonable expectations of future contracts in Africa in concert with Artilium.

52.     Defendant intentionally induced Artilium to breach the Agreement and to abandon the effort to enter into additional contracts with other African nations with Plaintiffs in order to provide the services it advertised it could provide.

53.     Defendant had and has no lawful justification for its tortious interference with the Agreement and prospective economic advantage for Plaintiffs in Africa.

54.     Plaintiffs have suffered and will continue to suffer damages due to Defendant's tortious interference with its contracts and/or prospective economic advantage.

55.     Plaintiffs and Defendant were competitors to provide the services AA intended to supply to the African market.

56.     Plaintiffs have suffered and will continue to suffer irreparable harm due to Defendant's tortious interference with its contracts and/or prospective economic advantage.

**WHEREFORE**, Plaintiffs demand that judgment be entered in its favor against Defendant on Count I of the Complaint for Plaintiffs' damages, exemplary damages, costs of this actions, and for such further relief the Court finds proper and necessary.

## <u>COUNT II</u>

### CONSPIRACY TO COMMIT TORTIOUS INTERFERENCE WITH CONTRACTS AND PROSPECTIVE ECONOMIC ADVANTAGE BY DEFENDANT

57.     Plaintiffs re-alleges and incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

58.     There are four elements to a claim of tortious interference with prospective contractual relations in Virginia: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

59.     Virginia recognizes two tort claims for civil conspiracy: The first under the common law and the second under Virginia Code §§ 18.2-499 to -500.

60.     Under Virginia common law, a plaintiff must prove four elements to state a *prima facie* cause of action for common law conspiracy:

- 12 -

      1.      A combination of two or more persons;

      2.      To accomplish, by some concerted action;

      3.      Some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means; and

      4.      Resultant damage caused by the defendant's acts committed in furtherance of the conspiracy.

61.    Under Virginia statutory law, a plaintiff must prove three elements to state a prima facie cause of action under Virginia's business conspiracy statute:

      1.      A combination of two or more persons;

      2.      For the purpose of willfully or maliciously inuring a plaintiff in reputation, trade, business, or profession; and

      3.      Resulting in damage to the plaintiff.

62.    Although the United States Circuit Court for the Fourth Circuit has held that the tortious interference claim failed as a matter of law because a party cannot interfere with its own contract, a conspiracy claim, when one of the co-conspirators is a party to the contract, can lie under the "third-party rule."

63.    The third-party rule states that even though a party to a contract or business relationship cannot be liable for interfering directly with that contract or relationship, that party may be held liable for conspiracy with another person to tortiously interfere with the contract or expectancy.

64.    As stated by the Fourth Circuit Court, "the third-party rule provides a cause of action in conspiracy against one who cannot be held directly liable for tortiously interfering with his own business relationship, but nonetheless encourages or induces an outsider to do so."

65.    Plaintiffs and Artilium had a valid contract, the Agreement whereby Artilium would provide software services relating to wireless phone and internet services in Africa.

66.     Plaintiffs had contracts and/or MOUs with 6 African nations for the provision of such services and and/or reasonable expectations of entering over a dozen more contracts with African nations concerning the provision of such services.

67.     Defendant had full knowledge of the Agreement.

68.     Defendant had full knowledge of Plaintiffs' reasonable expectations of future contracts in Africa.

69.     Pareteum, in agreement and concert with Artilium, caused Artilium to breach the Agreement and to abandon the effort of AA to enter into additional contracts with other African nations in order to provide the services it advertised it could provide.

70.     Defendant had and has no lawful justification for its tortious interference with the Agreement and prospective economic advantage for Plaintiffs in Africa.

71.     Plaintiffs have suffered and will continue to suffer damages due to Defendant's tortious interference with its contracts and/or prospective economic advantage.

72.     Plaintiffs and Defendant were competitors to provide the services AA intended to supply to the African market.

73.     Plaintiffs have suffered and will continue to suffer irreparable harm due to Defendant's tortious interference with its contracts and/or prospective economic advantage.

**WHEREFORE**, Plaintiffs demand that judgment be entered in its favor against Defendant on Count I of the Complaint for Plaintiffs' damages, exemplarily damages, costs of this actions, and for such further relief the Court finds proper and necessary.

Respectfully submitted,

 /S/ RAYMOND W. COBB

| | |
|---|---|
| KEVIN F. BERRY (PA BAR NO. 30058) | RAYMOND W. COBB (DE BAR #2653) |
| **O'HAGAN MEYER LLP** | **O'HAGAN MEYER LLP** |
| 100 N. 18th Street, Suite 700 | 1523 Concord Pike, Suite 200 |
| Philadelphia, PA 19103 | Wilmington, DE 19803 |
| 267-386-4353 (tel) | 302-684-6110 (tel) |
| 215-665-8300 (fax) | 302-777-4111 (fax) |
| kberry@ohaganmeyer.com | RCobb@ohaganmeyer.com |
| *Of Counsel* | *Attorneys for Plaintiffs* |

Dated: October 9, 2019